[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Jonathan Banquer, filed on October 4, 1991, a small claims action against the defendant, New Haven Housing Authority (NHHA) claiming unpaid rent of $549.60 and property damage of $1,246.00 caused by a tenant, Rose Mathews, covered by a housing assistance payment contract between the plaintiff and the defendant. The defendant answered and filed five special defenses. At trial, the defendant withdrew all special defenses, except number 5, alleging that the defendant's maximum liability is $1,246.00. On November 7, 1991, the defendant moved to transfer the case to the regular docket on the grounds that the defendant has a good defense to the action. That motion was granted November 15, 1991.
The court makes the following findings of fact:
1. The defendant is a quasi-municipal agency, also known as a "PHA" or "Public Housing Authority," which administers low and moderate income housing assistance programs in the City of New Haven, including the Section 8 Housing Program. CT Page 8138
2. As a PHA, the defendant operates its housing programs (and particularly the Section 8 Program) using federal monies that it receives from the United States Department of Housing and Urban Development ("HUD"). The Section 8 Program is therefore a creature of federal law and of federal regulation. See24 C.F.R. § 882.101 et seq.
3. Under the Section 8 Program, the tenant participant locates suitable housing in the private sector using a Section 8 housing certificate.
4. Once a landlord and the dwelling unit have been approved for the Section 8 Program, the tenant and the landlord execute a rental agreement for the dwelling unit, which includes a provision for the collection of a security deposit.
5. As part of this approval process for the program, the defendant agrees to pay, on a monthly basis, a portion of the tenant participant's contract rent.
6. The portion of the contract rent that the defendant pays to the landlord participant is based on the income of the Section 8 tenant participant.
7. The Section 8 tenant participant is responsible for the payment of the balance of the contract rent directly to the landlord participant.
8. The plaintiff was a landlord participant in the Section 8 Program and had been a landlord participant since January 1, 1986.
9. On January 1, 1987 and for a period of time thereafter up to and including November 1990, the plaintiff leased a second-floor dwelling unit at 46 Hurlburt Street in New Haven, CT to Ms. Rose Mathews pursuant to the said Section 8 Program.
10. Prior to August 1, 1989, the plaintiff and Ms. Mathews had executed a rental agreement entitled "Lease Agreement" and "Lease Addendum" for the said unit.
11. On August 1, 1989, pursuant to applicable federal regulations, the plaintiff (as a Section 8 landlord) and the defendant (as the administrator for the Section 8 Program) entered into a contract entitled "Housing Assistance Payments Contract" (henceforth referred to as "HAP contract"). CT Page 8139
12. Subsequently on August 1, 1990, the said HAP contract was amended by an "Addendum to the HAP Contract and Addendum to Lease."
13. During all pertinent time periods stated in the plaintiff's complaint, the terms, conditions and provisions of the said rental agreement, the said HAP contract and the said addendum remained in full force and effect and without modification.
14. Section 6(C) of the HAP contract limits the amount of the monetary damages that the defendant (as the administrator of the Section 8 Program) must pay to the plaintiff (as the landlord participant) if the landlord participant incurs damages arising out of the occupancy of the dwelling unit by the tenant participant.
15. Specifically, if the Section 8 tenant participant abandons or damages the unit, fails to pay rent, or otherwise breaches the rental agreement with the landlord participant, the landlord participant may seek reimbursement for the incurred monetary damages from the defendant. (See the said Section 6 of the HAP contract.)
16. The defendant's liability for reimbursement, under the said Section 6, is limited to a maximum of two (2) months contract rent less any security deposit collected (or which might have been collected) by the landlord participant. See 24 C.F.R. § 882.112(d).
17. Under the instant HAP contract for the plaintiff and the defendant, the contract rent was $687.00 per month, and the amount of the security deposit collected (or which could have been collected) by the plaintiff was $128.00.
18. Therefore, under the HAP contract, the liability of the defendant to the plaintiff for all damages under Section 6 due to Ms. Mathews' occupancy is limited to a maximum of $1,246.00. That is, twice the contract rent ($687.00 X 2), less the security deposit $128.00), or $1,374.00 less $128.00, for a total maximum liability of $1,246.00.
At trial, the defendant admitted liability in the amount of $549.60 in unpaid rent as claimed by the plaintiff because the tenant failed to return the keys to the dwelling unit to the plaintiff when she vacated on October 31, 1990. Therefore, under Section 7 of the HAP contract, the defendant is liable for a CT Page 8140 portion of the contract rent for November 1990. The defendant's liability is limited to 80% of $687.00, or $549.60.
Section 7(A)(1) reads as follows:
 (A). (1). If the Family moves from the Contract unit in violation of the Lease, the Owner shall receive the housing assistance payment due under the Contract for so much of the month in which the Family moves from the unit as the unit remains vacant. If the unit continues to remain vacant, the Owner shall receive from the PHA a housing assistance payment in the amount of 80 percent of the Contract rent for a vacancy period not exceeding one additional month, or the expiration of the Lease, whichever comes first.
The remaining issues at trial were who was responsible for damage to the premises and whether or not the plaintiff may recover an amount greater than that allowed under Section 6.
The court heard testimony from Monica Blazic, the NHHA Section 8 director; Jonathan Banquer; Charles Smith, property manager for the plaintiff; Ms. Mathews; Mr. Miller, NHHA inspector; and Iris Cordero, NHHA Section 8 Leasing Officer.
The tenant moved out in either late October or early November of 1990 and did not return the keys. She had been a tenant there almost four years. The plaintiff's property manager testified that the premises were a "mess" when she left: the walls were dirty, the hardwood floor finish was badly stained and worn, the bathroom fixtures were broken and closet doors were off the hinges. He testified that the only difference between his initial inspection when she moved out and when he was there with the defendant's inspector on February 1, 1993, was that the baseboards weren't missing. The tenant testified that she swept the floor and did not leave a bag of trash. She said the bedroom wall was dirty from fingerprints and dust. She said there was grease on the stove and no broken windows. She says she left the cabinets and did not take the thermostat. She testified that the floor covering was ripped and the bathroom sink was working and its legs were not missing. She said the light fixture was hanging by its wires. She said the CT Page 8141 baseboard heaters were there when she left; however, there was a hole under one of the baseboard heaters. She also said there were nail holes in the walls. Mr. Miller inspected the premises February 1, 1991; an earlier inspection scheduled for December 21, 1990 did not occur. Mr. Miller inspected the premises while Mr. Smith was present. He observed that the apartment appeared to have been vandalized. He then documented damage totalling $770.00 as follows:
(1) holes in the walls $ 150.00
(2) thermostat missing 50.00
(3) linoleum — tear 50.00
(4) light fixture 20.00
(5) bath — linoleum — tear 50.00
(6) bdrm. — rear — paint walls 150.00
(7) bdrm. — center — paint walls 150.00
 (8) Trash throughout apartment — clean 150.00 ------ $ 770.00
The plaintiff testified that the walls and ceilings had grease on them; the bathroom sink had been removed; the floors were not cleaned and were abused in areas; and linoleum was ripped and torn. He testified that she was the first tenant rouse that second floor apartment after he had completed a total "gut rehab" of the premises. He testified to extensive rehabilitation of the premises, from #1 choice hardwood oak floors to polyurethane moisture-cure treatment. He said Mr. Smith took photographs of the apartment when she moved out and dated them and give them to Mr. Winterbottom's (the NHHA"s['s] in-house counsel) secretary to justify his claims. The defendant has no record of the photographs.
The plaintiff testified that he called the defendant for an inspection on November 3 or November 4, 1990. He believed he spoke with Ms. Blazic. Ms. Cordero testified that he didn't call until sometime in December. Ms. Cordero asked for the inspection on December 6, 1990. It ultimately occurred on February 1, 1991.
The plaintiff disputed the amounts assessed by Mr. Miller to CT Page 8142 cover the repairs. He testified that $770.00 was extremely low to cover the damages. He strenuously objected to a lack of any monies to repair the floors.
Based on all the evidence presented and the credibility of the witnesses, the court finds that the tenant did cause damages to the plaintiff in the amount of $720.00, reduced by the $128.00 security deposit, totalling $592.00.
The final issue raised by the defendant was that the plaintiff was entitled to no more than $1,246.00 computed under Section 6 of the entire HAP contract. Even though the total amount awarded by the court is less than that amount, the court will address that issue. The defendant cited no specific language in the HAP contract, Section 6, or Section 7 of the contract to support that claim. The court has reviewed the HAP contract and did not find any language to support the defendant's conclusion. Furthermore, the defendant's own "Worksheet for Computing Claims in the Existing Section 8 Program" (Plaintiff's Exhibit E), page 3, supports the plaintiff's position that owner claims for uncollected tenant damages (from line R) are in addition to owner claims for vacancy loss (from line V). Therefore, the plaintiff is entitled to $549.60 (vacancy) and $592.00 (damages), or $1,141.60.
Plaintiff has requested attorney's fees pursuant to General Statutes, 52-251a, which states "[w]henever the plaintiff prevails in a small claims matter which was transferred to the regular docket in the superior court on the motion of the defendant, the court may allow to the plaintiff his costs, together with reasonable attorney's fees to be taxed by the court." This case, as originally framed, could have been litigated in the small claims forum, in an expeditious and less expensive fashion for both parties.
The plaintiff's counsel has submitted a statement indicating his fees were $1,845.00, plus one hour ($150.00), for the May 27, 1993 trial, or $1,995.00. If the defendant objects to this fee, it must file its objection with detailed reasons within two weeks. If no written objection is filed, the court will award reasonable attorney's fees in the amount of $1,995.00.
The plaintiff also requests the 10% statutory interest under General Statutes 37-3a from September 6, 1991 (the date of the Worksheet prepared by the defendant allowing the plaintiff only $549.60) until the judgment date and thereafter. CT Page 8143
C.G.S. 37-3a, as amended, allows interest of ten (10) per cent a year as damages for the detention of money. This prejudgment interest is assessed from the date the money became due and payable. The determination of whether such interest will be assessed in contract actions, which raises a question of fact, hinges on whether the detention of money was wrongful under the circumstances. See Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 748, 750 (1989); Ottaviani v. Pechi,16 Conn. App. 705, 708 (1988). This determination lies within the trial court's discretion. Associated Catalog Merchandisers, Inc.,210 Conn. at 749. C.G.S. 37-3a determines post-judgment interest, even when an offer of judgment has been made. Gionfriddo,192 Conn. at 308.
The court has the equitable power to award interest as part of damages. Nor'easter Group, Inc. v. Colossale Concrete, Inc.,207 Conn. 468, 482-83 (1988); Milgrim v. Deluca, 195 Conn. 191, 201
(1985; Bertozzi v. McCarthy, 164 Conn. 463, 466-67 (1973). This power, however, is applicable to actions tried to the court rather than to the jury.
The court finds that under the circumstances of this case the detention of the money after September 6, 1991, was wrongful and therefore awards this interest from that date and forward.
In conclusion, judgment to enter for the plaintiff in the amount of $1,141.60, plus attorney's fees provided for in this decision, plus interest from September 6, 1991, and costs.
SO ORDERED.
Clarine Nardi Riddle, Judge